UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
NORTHERN DIVISION

REBECCA D. MCALISTER,           )
                                )
        Plaintiff,              )
                                )
    vs.                         )           Case No. 2:14CV1 CDP
                                )
CAROLYN W. COLVIN,              )
Acting Commissioner of Social Security, )
                                )
        Defendant.              )

## MEMORANDUM AND ORDER

This is an action under 42 U.S.C. § 405(g) and 42 U.S.C. § 1383(c)(3) for

judicial review of the Commissioner's final decision denying Rebecca D.

McAlister's application for supplemental security income (SSI) under Title XVI of

the Social Security Act.  42 U.S.C. §§ 1381 *et seq*.  McAlister claims she is

disabled due to a combination of impairments including a learning disability,

migraines, bipolar disorder, depression, sleep apnea, fatigue and back pain.  After a

hearing, the Administrative Law Judge concluded that McAlister is not disabled.

Because I conclude that the ALJ's decision is supported by substantial evidence in

the record as a whole, I will affirm the decision.

## I.    Procedural History

McAlister filed her application on February 16, 2011.  She alleged a

disability onset date of October 1, 2010.  When her application was denied, she

requested a hearing before an administrative law judge. She then appeared at an administrative hearing on July 11, 2012, where she was represented by counsel. McAlister and a vocational expert testified at the hearing.

After the hearing, the ALJ denied McAlister's application in a decision dated November 9, 2012, and McAlister appealed to the Appeals Council. On December 13, 2013, the Council denied her request for review. The ALJ's decision thereby became the final decision of the Commissioner. *Van Vickle v. Astrue*, 539 F.3d 825, 828 (8th Cir. 2008).

McAlister now appeals to this court. She argues that: (1) the ALJ erred in not according controlling weight to the opinion of her treating physician Dr. David Goldman; (2) the ALJ erred in finding that her mental impairments do not meet a listing under sections 12.04 or 12.06 of 20 C.F.R. pt. 404, supt. P, app. 1; and (3) the ALJ's credibility determination is "patently erroneous." McAlister claims these mistakes led to a decision by the ALJ that was not supported by substantial evidence in the record and should be reversed or remanded for further evaluation.

## II.  <u>Evidence before the Administrative Law Judge</u>

*<u>Prior Disability Decision</u>*

In addition to the disability application currently at issue, McAlister previously filed applications for disability insurance benefits and supplemental security income on May 9, 2005. These claims were dismissed by an ALJ in an

Order of Dismissal dated August 31, 2007, due to McAlister's failure to appear at the scheduled hearing.

*Function Reports*

In support of her application, McAlister completed a function report in February 2011. She reported that she lived with her boyfriend, Ron Bruce. She wrote that her daily activities consisted of watching television, taking naps, cooking her own meals, bathing, and going to the store or to a family member's house for a visit. She reported that she feeds the pet cat and changes its litter box. She wrote that she has a sleep disorder due to her conditions but has no problem with personal care and needs no reminders to take care of personal needs or grooming. She wrote that she does need reminders to take medicine. McAlister checked boxes indicating that she is able to do laundry, mop, sweep, clean dishes and occasionally help in the yard. She reported that she goes outside daily and is able to go out alone, and when she goes out she walks, drives a car, or rides in a car. She wrote that she goes shopping once a month for about an hour and is able to pay bills and count change.

Socially, McAlister reported that she regularly goes to her family members' homes, and she spends time with others on the phone, on the computer, and in person. Since the onset of her condition, McAlister wrote that she forgets things, doesn't understand things very well, and has occasional problems following

instructions, particularly spoken instructions.  She also has difficulty getting along with other people, particularly her family, and since the onset of her condition she stays more to herself.  She reported that she has no problem with authority figures and does what she is told to do but was fired from her job at McDonald's for not getting along with others.  She reported that she has difficulty handling stress and changes in routine.  In a Missouri supplemental questionnaire, McAlister noted that she has never had a valid driver's license because she could not pass the test. (Transcript at 157-167).

McAlister's boyfriend, Ron Bruce, completed a third party function report for her in February 2011 that largely coincides with hers.  He wrote that he had known McAlister for 16 years and her daily activities include watching television, playing computer games and talking to people on the computer.  She also helps him care for their cat.  He reported that since the onset of her condition, McAlister has trouble understanding instructions, gets upset over small things, and has a lack of motivation. She needs to be reminded to take her medicine but is able to prepare meals by herself and can do household chores like cleaning and laundry.  He reported that she goes outside "all the time," can go out alone, walk, drive a car, and ride in a car.  She shops once a month for an hour, can count change and can pay bills "as long as she knows how much to pay."

He wrote that since the onset of her condition McAlister tends to lose money more or forget where she put it.  For social activities, Bruce wrote that she spends time with others on the computer and phone and regularly goes to family members' houses, although she has trouble getting along with them.  Since the onset of her condition, Bruce reported that McAlister has become less social, she has trouble understanding and completing tasks, gets distracted easily, and has trouble remembering things.  He wrote that McAlister does not follow written instructions very well "if you don't show her and explain" and spoken instructions must be repeated to her often.  Bruce reported that while McAlister has no problems with authority figures, she was fired for not getting along with others at her job.  He wrote that under stress she will cry "or go hide" and if there are changes to her routine "she will shut down and not talk like she is in a daze."  (Tr. 168-175).

*High School Transcript*

McAlister's high school transcript from South Shelby High School for the 1998-99 school year indicates she completed 6.5 of 7.0 credits attempted and had a GPA of 1.64 for the year.  (Tr. 176).

*Medical Records*

<u>General</u>

From July 12 to September 20, 2010, there are outpatient discharge notes from McAlister's regular prenatal visits to Hannibal Regional Hospital.  (Tr. 249-259).

On October 4, 2010, McAlister was seen by Dr. Aziz Doumit at the Hannibal Regional Hospital emergency room for vaginal bleeding two days after giving birth to her son. Dr. Doumit's report states that McAlister is "a well appearing, well-nourished individual" whose hygiene is good and who is dressed to season. The report notes that her mood and manner are appropriate. (Tr. 228-244)

On November 20, 2010, McAlister presented at the Hannibal Regional Hospital complaining of an insect bite. The hospital notes indicate that she did not report feeling sad, anxious, overwhelmed, or helpless. It describes her affect as calm and appropriate. (Tr. 222-27).

## Migraines

Once in May and twice in July 2010, McAlister presented at Hannibal Regional Hospital complaining of a migraine headache. Twice she was given intravenous Phenergen and discharged. Once, she was given intravenous Compazine and discharged. During her second July visit, the hospital notes state McAlister reported several times that her headaches may have developed "secondary to multiple verbal disputes with her significant other." (Tr. 260-68, 270-292).

## Mental Health History

McAlister was seen by nurse practitioner Mary Chapel at the Hannibal Clinic on August 3, 2010. She complained of a one-week history of frequent crying and mood swings. The report notes McAlister stated she had been diagnosed with bipolar and placed on Carbatrol three years previously but she had not taken any of the medication for "some time." (Tr. 671).

On September 3, McAlister was seen at the Community Health Center for complaints that she was crying all the time. The report from this visit notes that she is pregnant; another note states that she was told to return after the birth of her child. (Tr. 218-219). On October 26, 2010, McAlister was again seen at the Community Health Center. The clinic report from the visit indicates McAlister was on medication for her migraines. Her chief complaint is listed as "needs to get back on med." At this visit she was referred to counseling and prescribed Depakote for bipolar disorder. Her affect, mood and memory are listed as normal. (Tr. 217).

On March 16, 2011, clinical psychologist Dr. Frank Froman provided McAlister with a Mental Status Examination at the request of Disability Determinations of Jefferson City, Missouri. His report indicates he spent 45 minutes with McAlister, and she was "casually and neatly attired and of excellent hygiene." Froman reported that McAlister was in special education throughout school and has completed the eighth grade. When she was in ninth grade, because of the severity of her learning problems, the principal said it would be better to

drop out because her needs were taking too much of the teacher's time. Froman's report indicates McAlister complained of migraines and sleeping problems. She told him she takes Trazodone to sleep, ibuprofen for pain, hydroxyzine, and Depakote for bipolar disorder.

Froman noted that McAlister

…presented in a slightly anxious and somewhat odd fashion. She had the characteristic stare of one who was slightly schizoidal. Her ability to relate was just fair. She was nervous but presented with clear speech. I often had to clarify questions for her, since things had to be presented quite concretely.

Froman reported that McAlister socializes minimally, does not have a drivers' license and for hobbies she plays on the computer and walks in the park with her boyfriend. He further reported that she could name no current presidents except Clinton and knew no large cities except Quincy and Chicago. She incorrectly added 9 plus 6, could not multiply, subtract or perform serial 7s.

Froman noted that McAlister alleged she was given Ritalin when she was younger for ADHD and has never been able to focus. She reported suffering episodically from down moods during which she can be "nasty and mean spirited." Her medication does not fully alleviate her down moods. Froman noted that without prior documentation it was unclear as to whether McAlister still suffers from a true bipolar disorder.

In his report, Froman concluded that McAlister has low borderline to high mentally retarded intellectual functions; functional illiteracy; a history of migraines; moderately severe psychological issues and a GAF of 50. He reported:

> Rebecca appears to function at a fairly slow rate, and it is doubtful that she would be able to perform one or two step assemblies at or even near a competitive rate. Her ability to relate effectively to co-workers and supervisors is limited by considerable lack of confidence, distrust with others, and a sense of alienation and distance. In addition, it appears that she has few, if any, executive skills. She also appears to be ill formed as a person, with a very weakened character structure and an almost non-existent self concept.

> She is not able to understand any but the most simple and straight forward oral instructions. She is unable to read, unable to manage benefits, and appears unlikely to be able to withstand the stress associated with customary employment until such time as she might be "work hardened," and in a developmental training program that would allow her to learn competitive skills, and ultimately "get on her feet."

> (Tr. 293-96).

After Froman's examination, Margaret Sullivan, PhD, completed a Psychiatric Review Technique for McAlister on April 6, 2011. She concluded that McAlister suffers from medically determinable impairments of ADHD and borderline cognition, as well as bipolar disorder, but the impairments do not precisely satisfy the diagnostic criteria listed on the form. She reported that these impairments cause a mild restriction in the activities of daily living, moderate difficulties in maintaining social function and concentration, persistence or pace, but no repeated episodes of decompensation. In her written notes, Sullivan

reported that notes from McAlister's ER visits in 2010 show no depression or anxiety, and report normal mood, affect and mentation. Sullivan noted that at a November 20, 2010 visit to the ER for an insect bite, McAlister denied feeling sad or anxious, over-whelmed and/or hopeless, and mental status showed her affect was calm and appropriate. She noted McAlister has a "significant legal history with incarceration and probation." She went on to summarize much of Dr. Froman's report. Finally, she noted that McAlister's mental status examination in the ER showed her function was not as impaired as her clinical mental status examination indicated. Sullivan noted that in the past, McAlister has been successful at minimally skilled tasks in an environment that restricts her social contact. (Tr. 297-307).

On November 21, 2011, an initial psychosocial/clinical assessment for the Missouri Department of Mental Health, Division of Comprehensive Psychiatric Services was completed by Emilee Hill, MEC, LPC, RASAC II. The report states McAlister was referred to the Community Psychiatric Rehabilitation Program (CPRP) by Mark Twain Behavioral Health (MTBH) and is signed by staff members at MTBH, including psychiatrist Dr. David E. Goldman. The report states McAlister presented to her interview with "adequate hygiene." The report notes that McAlister states she has problems with asthma, migraines, sleeping disorder, seizures, blindness in her right eye and scoliosis. She is on multiple

medications and has been having seizures, with her most recent one occurring a month prior to the assessment. McAlister stated she experiences seizures once a month. McAlister reported she has trouble sleeping and has problems with anxiety and depressed mood, but denied problems with anger. The report indicates McAlister's interview behavior was cooperative, her flow of thought was normal, and she stated her mood was "good," which was congruent with her affect. The report notes that her intellect appears slightly below normal, though her insight and judgment appear fair with regard to the importance of her treatment.

The report lists McAlister's diagnoses as bipolar disorder, post-traumatic stress disorder and learning disorder. It also states she has asthma, migraines, seizures, blindness in her right eye, and scoliosis. She has moderate occupational problems, severe economic problems, mild legal problems and moderate problems with daily living skills. It lists her GAF (Axis V) as "[c]urrent 55, past 65." The report states McAlister has a driver's license and that McAlister indicated she enjoys doing crosswords, playing on the computer and reading. She stated she has a lot of friends and listed approximately nine first names. The report notes that McAlister is motivated for treatment and recognizes the importance of treating her symptoms. She carries a medication list with her. (Tr. 332-37).

A Missouri Department of Mental Health Individual Treatment and Rehabilitation Plan was also created for McAlister on November 21, 2011. It

recommends her participation in the CPRP and states that she will learn to manage the symptoms of her mental illness by taking medications, following treatment recommendations, developing coping skills and building supportive relationships. The plan states McAlister will see Dr. David Goldman for a psychiatric evaluation and attend psychiatric appointments and other MTBH appointments, and take medications as prescribed. (Tr. 349-352).

From December 2, 2011, to March 30, 2012, the medical records indicate McAlister met regularly with Genia Perry, CSS/MS/CMA, a community support specialist with MTBH. She met with Perry as part of what appears to be a complete and integrated program of counseling and psychiatric services provided to her by MTBH. Perry completed progress notes documenting her meetings with McAlister. Those notes consistently indicate that although McAlister generally responds appropriately to the support provided, her "limited intellectual functioning" interferes with her ability to grasp concepts, identify and discuss issues in her life, and follow through with suitable solutions. Perry reported that McAlister struggles with attaching emotions to the appropriate source. The notes indicate McAlister kept a list of her medications in her purse and was able to properly discuss her medications upon referencing the list. (Tr. 310-329).

It appears that as part of her program with MTBH, McAlister also had several therapy sessions with Janice Winn, MED/PLPC during January, February,

and March 2012.  Notes from these sessions indicate McAlister, for the most part, was "clean" and able to discuss her concerns and stressors in an appropriate manner.  (Tr. 344-48).

The medical records indicate that McAlister began seeing her treating psychiatrist, Dr. David Goldman of MTBH in early 2012.  His January 9, 2012 report, from what appears to have been their first meeting, states that McAlister is on various medications including Hydroxyzine, Prochlorperazine, Depakote, Trazodone, Meloxicam, and Carbatrol.  Goldman's notes indicate McAlister was polite, cooperative and conversant.  She maintained good eye contact and was oriented to person, place, time and situation, but she was unable to name the current president.  She could spell "world" backward correctly, with minor hesitation; after five minutes, she recalled three words she was given correctly and in the same order that they were originally presented.  She stated her main goal for the appointment was to get back on her medication.  Goldman reported his impressions as:

> Axis I: Bipolar disorder type I most recent episode mixed, moderate
> Axis II: Deferred
> Axis III: Seizure disorder; migraine headaches; sleep disorder NOS
> (insomnia); current GI distress that is being evaluated by her
> family physician.
> Axis IV: Severe
> Axis V: 45

He noted that McAlister's Depakote and Trazodone medication doses would be adjusted upward by him, and McAlister would follow-up with him in 3-4 weeks and would continue to follow up with her family practice physician and neurologist. On January 30, 2012, Goldman completed a psychiatric progress note for McAlister. She reported to him that she was doing well, and he continued her current medication regimen of Trazodone and Depakote. Goldman completed another psychiatric progress note on March 19, 2012 in which he reported he was increasing her Depakote level. (Tr. 341-43).

A quarterly review of McAlister's progress was held by MTBH on January 17, 2012. The quarterly review report notes that McAlister has continued to schedule and attend all psychiatric appointments on her own and has not identified or verbalized any difficulties in association with these responsibilities. She has continued to participate in all nursing clinics associated with her psychiatric appointments. She has identified depression and anger as her primary symptoms but denied any recent major concerns in association with anxiety. (Tr. 330-31).

<u>Seizure History</u>

On July 22, 2011 McAlister was seen by the Hannibal Regional Medical Group for complaints of seizures. The group's report notes that she complained of having a seizure on July 20 lasting thirty minutes, accompanied by a loss of awareness, and followed by confusion, drowsiness, headache and weakness. The

report states that according to McAlister, she was diagnosed with seizures in 2007 and was sent to Columbia, Missouri for evaluation but failed to make it to her follow-up appointment because her husband would not let her go. She had one seizure during a 2007 pregnancy, was seen by Dr. Hosley and placed on Topamax, which she only took for 30 days. She had not had a seizure since that time. (Tr. 438-39).

Three days later, on July 25, 2011, McAlister presented at Hannibal Regional Hospital for recurrent seizure activity. She reported having had four seizures that day. (Tr. 397- 424). McAlister attended a follow-up appointment at Hannibal Regional Medical Group on August 8, 2011 for her complaint of seizures. McAlister stated she had not had a seizure since her last appointment. (Tr. 442-45).

On August 31, 2011, McAlister was seen by neurologist Brett Hosley in consultation for her reported seizures. Dr. Hosley's notes state that the information McAlister gave him during the consultation "differ[ed] from one point in the examination to the next. It also differ[ed] from what previous records indicate." He noted that when he tried to get more details about her seizures she again gave him varying and inconsistent information. According to his report, McAlister claimed she first had seizures in 2006. She told Hosley that she had been having episodes about every two to three weeks since the onset of the seizures, but she

also told him, conflictingly, that she had not had any seizures while taking certain medication.  Additionally, Hosley's report notes that the emergency department records indicated McAlister said she had not had a seizure for over a year prior to a seizure she had in July 2011.  Hosley reported McAlister stated she also has intermittent migraines.

McAlister also told Hosley that she was put on Topamax for seizures right after her first episode in 2006.  She was switched to another medicine shortly afterward due to pregnancy but then ran out of that medicine in 2007.  Hosley reported that the Hannibal Regional Hospital notes indicated McAlister reported a seizure on July 20, then four seizures on July 25.  Hosley's report indicates McAlister told him she had not been taking any of her medicines like she was supposed to and has difficulty taking medicine.  She had not taken Depakote for her bipolar disorder for four weeks.

Dr. Hosley reported that McAlister's mental status was within normal limits for her age but she had a "somewhat blunted affect."  Dr. Hosley ordered an EEG, an MRI scan of McAlister's brain, started her on Carbatrol and recommended she contact Mark Twain Mental Health for a psychiatric evaluation.  (Tr. 683-89).

On September 5, 2011, McAlister was seen at the Hannibal Regional Hospital for complaints of dizziness.  It was determined that she was having a

reaction to Carbatrol. She was ordered to stop her Carbatrol and call Hosley in the morning. (Tr. 470-481).

Dr. Hosley's next note regarding McAlister is dated September 6, 2011. His report indicates he received her medical records regarding her seizure problems from 2006. McAlister was seen primarily by Dr. Faisal Rajain in Columbia, Missouri. Those records noted the doctor's conclusion that the spells she was having were not epileptic seizures.

Dr. Hosley's September 6 report also states that the Hannibal Regional Hospital emergency department had recently contacted him because McAlister had come to the ER complaining of dizziness after starting the Carbatrol he prescribed. He told the ER to tell her stop the medicine and to contact him in the morning. She failed to contact him, so his office contacted her. She reported that along with starting her Cabatrol, she had also started herself back up on all the other medications she had told Dr. Hosley she was no longer taking at their last visit. She did this without the guidance or oversight of a doctor, which meant she started all the medications back up around the same time at maximum dosage without them being "titrated upward." Dr. Hosley's report states it may be that her dizziness was related not to the Carbatrol alone but to her starting all of her medications at maximum dosage at the same time. He told her to continue the

Cabatrol and stressed to her the importance of not changing her medications on her own without talking to a doctor. (Tr. 690-92)

As ordered by Dr. Hosley, on September 9, 2011 a brain MRI was done on McAlister. It revealed a Chiari I malformation (Tr. 680); as a result, a follow-up MRI of the cervical spine was done on October 3, 2011. The results of the cervical spine MRI were normal. (Tr. 679). Additionally, on September 9, 2011 McAlister received the EEG ordered by Dr. Hosley, and the results were normal. (Tr. 681).

Dr. Hosley next saw McAlister on September 14, 2011. His report from that date indicates she reported having one seizure since her last visit, which she described as shaking all over the right side of her body and lightheadedness, all of which resolved within 20 minutes. His report notes that she was generally cooperative throughout the exam, but states that she had been "very noncompliant" in the use of her medication. An addendum to this report states that her serum levels from this visit indicated she was still not taking her medications appropriately. He encouraged her to follow up with Mark Twain Area Counseling for a psychiatric evaluation. A later note from Dr. Hosley reported he made arrangements for McAlister to be seen by University of Missouri epilepsy Department on October 21, 2011, but she failed to keep the appointment because she "ran out of gas or something." She was supposed to follow up with Dr. Hosley

four weeks after her September 14 appointment, but failed to do that as well.  (Tr. 693-98).

On October 3, 2011, McAlister went back to Hannibal Regional Medical Group for a recheck of seizures.  The report states McAlister said she had had no seizures since Dr. Hosley put her on Carbatrol.  (Tr. 446-48).

On April 2, 2012 McAlister attended an appointment with Dr. Hosley.  The appointment was scheduled after she called him on March 27, 2012 to report the occurrence of two seizures that day.  She reported that she had run out of medication on March 23.  The seizures lasted ten minutes and ten seconds respectively.  She had another seizure on March 28 of unknown duration.  McAlister had failed to schedule any follow-up appointments with Hosley since her September 2011 appointment.  Hosley's notes from the April 2 visit indicate McAlister reported regularly seeing her psychiatric care provider at Mark Twain Area Counseling.  He again noted that McAlister had a blunted affect.  He convinced her to reschedule her appointment with the epileptologist at Columbia, Missouri for May 3, 2012.  (Tr. 701-05).

McAlister presented to Hannibal Regional Hospital on April 24, 2012 complaining that she had fainted twice in the past two days.  Both incidents were un-witnessed and she was discharged the same day after being diagnosed with syncope (fainting).  (Tr. 730-750).

On May 4, 2012 Dr. Hosley noted that McAlister called to say she had seen the epileptologist at the University of Missouri, and he indicated her spells might be related to her depression. She was scheduled for 72-hour video EEG monitoring on July 2, 2012. (Tr. 801).

McAlister reported to Hannibal Regional Hospital on May 23, 2012 reporting dizziness she claimed was due to the medication Klonopin, which was prescribed to her by her doctor in Columbia. She was discharged the following day after being diagnosed with a drug reaction and ongoing urinary tract infection. (Tr. 752-767).

McAlister returned to see Dr. Hosley on May 30, 2012. His report from that visit notes that since he had last seen her, she reported having three seizures – two on May 18 and one on May 19. Two of the seizures lasted for five minutes and the other one lasted for ten minutes. Afterward, she reported being groggy and not knowing where she was. Prior to the seizures she had been talking about the adoption of her young son, which had made her very upset. Dr. Hosley also noted he had received records from the University of Missouri, where McAlister was evaluated by Dr. Manjamalai Sivaraman. Sivaraman's notes stated McAlister had a several year history of generalized and right-sided shaking with loss of consciousness but without evidence of incontinence of urine or stool or of biting her tongue or lips. Shaking usually lasted 15-20 minutes and occurred twice per

day.  Sivaraman's notes stated these spells were most likely consistent with

psychogenic, non-epileptic seizures due to the fact that many of them were

preceded by stress, and he ordered a video EEG.  McAlister reported to Dr. Hosley

that after another shaking spell on May 21, the doctors in Columbia, Missouri

started her on Klonopin.  She had a bad reaction to the drug, however, and they

told her to discontinue it on May 24.  Between that time and the date of her visit to

Dr. Hosley, she had had no further issues.

*Records Produced Subsequent to ALJ Hearing*

Additional records from MTBH that were not available to the ALJ were

submitted by plaintiff to the Appeals Council in conjunction with her appeal.  They

consist primarily of "Progress Note" forms completed by Genia Perry.  The dates

of these approximately 24 notes run from April 5, 2012 to November 2, 2012.  In

them, Perry has documented various concerns as well as points of progress by

McAlister.  Her notes observe that McAlister's "limited intellectual functioning

interferes with her ability to identify and verbalize problems as they occur," that

McAlister interacted appropriately at most of their meetings, that McAlister denied

medication problems even though her medication count showed she had been not

been taking her medications as prescribed, that McAlister is "able to identify and

verbally express her feelings… but struggles with communicating her feelings and

needs in an assertive manner," that she tends to express all emotions through anger,

that her insight in relation to coping mechanisms continues to be limited, that she has a "desire to continue working on her anger issues," that she claimed to have received paperwork confirming she would begin receiving disability benefits, that her understanding of paperwork is questionable, that she could identify dates of upcoming appointments, and that she struggles with sharing her emotions. (Tr. 807-854).

In a meeting with Perry on July 27, 2012, McAlister indicated she had been in a recent physical altercation with her brother's sister. She stated that she was offended by what the sister was saying and had responded physically. She admitted that she tends to respond to stress in an unhealthy manner. (Tr. 833-34).

The new records also consist of two quarterly reviews done by McAlister's MTBH care providers. In an April 11, 2012 quarterly review it was reported that McAlister had continued to schedule and attend all appointments at MTBH on her own and had participated in all nursing clinics associated with her psychiatric appointments. (Tr. 857-58). In a July 11, 2012 quarterly review it was reported that McAlister had continued to schedule and attend all psychiatric appointments and associated nursing clinics on her own, with minimal assistance from her boyfriend. She had not expressed any difficulties in association with her appointment responsibilities. (Tr. 855-56).

The additional records also include an annual psychosocial/clinical assessment, dated October 26, 2012, for the Missouri Department of Mental Health, Division of Comprehensive Psychiatric Services.  The report was completed by Ted Oliver, MSW, LCSW, CRAADC and signed by McAlister's MTBH care providers.  It states that McAlister came to the appointment with good hygiene and grooming.  Her thoughts were clear and goal directed.  The report states her affect was bland, but there was no evidence of retardation.  Intellectually, the report states McAlister is functioning at an average to below average level. The report characterized McAlister's diagnostic formulation as follows:

Axis I:      296.52 – Bipolar disorder, most recent episode depressed
             309.81 – Post traumatic stress disorder by history

Axis II:     315.0 – Learning disorder, NOS

Axis III:    Asthma
             Migraines
             Seizures
             Blindness in right eye
             Scoliosis

Axis IV:     32 – Occupational problems
             52 – Economic problems – moderate
             81 – Problems with daily living skills – mild

Axis V:      Current global assessment of functioning 55, highest during the past year 60

McAlister indicated that she does all of the household management.  The report notes that she has a supportive relationship with her fiancé, reports to be

medication compliant, and has multiple friends that she interacts with. It further notes that during the meeting McAlister indicated she had been approved for disability. McAlister identified herself as being easily annoyed by people and having difficulty with her self-esteem. (Tr. 861-65).

_Medical Source Statements_

McAlister's psychiatrist, Dr. David Eckstein Goldman, completed a Medical Source Statement of Ability to Do Work-Related Activities (Mental) medical source statement for her on June 29, 2012. He indicated McAlister's ability to understand, remember, and carry-out instructions is affected by her impairment. His assessment notes that "[d]ue to limited intellectual function, patient unable to process instructions either simple or complex. Patient unable to understand and/or retain information." He rated her restrictions related to understanding, remembering and carrying out simple instructions as "marked." He rated her restrictions related to the ability to make simple, work-related decisions; understand, remember, and carry-out complex instructions; and to make judgments on complex work-related decisions as "extreme."

Goldman indicated that McAlister's ability to interact appropriately with supervision, co-workers, and the public, and to respond to changes in the routine work setting was affected by her impairments. He rated her restrictions related to interacting with the public, with a supervisor and with co-workers as "marked."

He rated her restrictions related to responding appropriately to usual work situations and to changes in a routine work setting as "extreme." Goldman noted that McAlister experiences extreme anxiety being with others. She is unable to comprehend, retain and call upon information, which leads to frustration. She has difficulty utilizing healthy coping skills.

Finally, Goldman noted that McAlister has difficulty with relationships and implementing appropriate coping skills. He agreed with the onset date of her disability as October 1, 2010. (Tr. 797-98).

*Residual Function Capacity Assessment*

Medical consultant Margaret Sullivan performed a mental residual functional capacity assessment of McAlister on April 6, 2011. It does not appear that this assessment was part of the record before the ALJ, but why it was not is not clear. Her report concludes as follows:

A.  Understanding and Memory – The claimant retains the ability to understand and remember simple instruction.

B.  Sustained Concentration and Persistence – The claimant can carry out simple work instruction. The claimant can maintain adequate attendance and sustain an ordinary routine without special supervision.

C.  Social Interaction – The claimant can interact adequately with peers and supervisors in a work setting with limited social interaction.

D.  Adaptation – The claimant can adapt to most usual changes common to a competitive work setting.

At the administrative hearing before the ALJ on July 11, 2012, McAlister testified that she attended school into but not completing 8th grade. She was always in learning disabled classes and decided to leave school because a principal told her she was wasting the teacher's time. (Tr. 33).

McAlister testified that she does not have a driver's license, has been married twice and was, at the time of the hearing, engaged to be married again. She testified that she has seven children, none of whom live with her and all of whom, except the youngest, have been removed by DCFS and adopted. She confirmed that she has had jobs in three different nursing homes, as a nurse's aide and as a housekeeper. She testified that the nurse's aide jobs ended because she was never able to pass the certified nurse's aide classes and without a CNA license she could not stay on the jobs. She testified that the housekeeper job ended because she wanted to try staying home with her baby. She also previously worked for a McDonald's for 2-3 months but stated that job ended because her ex-husband refused to take her to work. Finally, McAlister testified that she worked for CNS International Ministries, a women's program. While working there she was assigned daily chores and frequently had difficulty remembering to do them. (Tr. 34-37).

McAlister testified Dr. Goldman had been treating her for about a year. She stated that she understood her diagnosis from him to be a learning disability and indicated that he also had her on a sleeping medication and bipolar medication. McAlister testified that due to her bipolar disorder, she typically has one or two bad days a week, during which she takes out her stress on other people by "yelling and screaming at each other." On those days she will also sit and cry for 10-15 minutes at a time approximately twice a day. McAlister stated she has memory problems and cannot remember what she is told to do very well. (Tr. 38-42). She is on a sleeping medication that helps her sleep, but she still sometimes has bad nights, which she characterized as nights where she gets three to four hours of sleep. (Tr. 47-48).

McAlister indicated she has approximately two episodes of right-sided shaking per week during which she loses consciousness. The episodes last ten minutes or less and when she wakes up she is disoriented. She has seven to eight migraines in a month, but takes ibuprofen for them. They generally resolve within two hours of taking ibuprofen. (Tr. 48-49)

She testified that none of her jobs has lasted very long because she is unable to get along with other people. She would always be fighting, and "not liking to take responsibilities." For instance, she argued with a lot of her co-workers at her nurse's aide jobs and would have to walk out of the building because she was

worried she would hit someone.  She testified she was given a three-day suspension at one of these jobs.   (Tr. 42-43).

McAlister testified to being in foster care from ages 3 to 10 and 11 to 13 due to her mother's alcoholism and abuse.  She testified she was raped by her father at ages three, twelve, and fifteen.  She has been married twice before, and both husbands were physically abusive.  Currently she lives with her fiancé and is helping care for his elderly mother in their home.  (Tr. 43-47)

McAlister stated she has attempted to get her GED five times and failed. She believes she is at a first grade reading level.  (Tr. 50-51).

*Vocational Expert's Testimony*

Vocational expert Bob Hammond also testified before the ALJ.  He classified prior jobs held by McAlister, long enough for her to learn them, as follows: (1) cashier – light; (2) janitor – medium; and (3) fast food worker – light. The ALJ then asked Hammond to consider a hypothetical individual under the age of fifty with a seventh grade education, no GED, McAlister's past work history and who could lift twenty pounds occasionally, ten pounds frequently; stand and walk six hours in an eight-hour day; sit six hours in an eight-hour day; never climb ladders, robes or scaffolds; occasionally balance, kneel, crouch, crawl, stoop and use ramps or stairs; never be exposed to dangerous, unprotected heights or moving machinery.  The ALJ's hypothetical person could only perform simple routine

tasks that involved primarily working with things rather than people; and social interaction should be with co-workers and supervisors only, with no direct interaction with the public. Hammond said all of McAlister's past work would be precluded under this hypothetical, but such a person could perform jobs as a housekeeper, hand washer or hand presser. (Tr. 53-55).

The ALJ then asked Hammond to consider how many episodes of right-sided shaking, lasting 10 minutes and followed by disorientation, the same person could have and still have the jobs identified by Hammond. Hammond testified that in his opinion, a person with episodes like that would not be able to maintain employment. (Tr. 55).

In consideration of McAlister's migraines, the ALJ then asked Hammond how often that hypothetical worker could be absent and still do those jobs. Hammond testified that such a worker could be absent no more than 1.5 days per month after a probationary period of ninety days. During the 90-day probationary period, such a worker could not be absent at all. (Tr. 55).

Next, the ALJ asked Hammond how often such a worker could have an oral altercation with a supervisor or co-worker and still do the job. Hammond testified that if a person gets into an oral altercation twice in the same week with a supervisor, he could not maintain the job. He testified that such a person could likely have four or five altercations with the same co-worker in a month before

"anything drastic" would happen, but if the altercations were with multiple co-workers he could likely not maintain a job after three or four altercations in one month. Hammond testified that a worker would likely be terminated after one physical altercation with a supervisor or after two physical altercations with a co-worker. (Tr. 55-57).

During Hammond's testimony, before McAlister's attorney began his examination, the ALJ noted that he was aware of Goldman's medical source statement and that Goldman had "basically checked off all markeds and extremes." The ALJ stated that Goldman is not qualified to express whether a listing is met, but "what he's indicating is in effect, listing all of the severity, and there's no point in posing that to the VE. The real question is whether his treatment notes support it." (Tr. 57).

During his examination by McAlister's attorney, Hammond expressed that he was not entirely sure what a "one and two step assembly" job would be. He noted that the Dictionary of Occupational Titles talks about one, two and three step assembly operations, but it does not provide any guidelines as to what those might be. (Tr. 57-59).

## III.    Standard for Determining Disability under the Social Security Act

Social security regulations define disability as the inability to engage in any substantial gainful activity by reason of any medically determinable physical or

mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 416(i)(1); 42 U.S.C. § 1382c(a)(3)(A); 20 C.F.R. § 404.1505(a); 20 C.F.R. § 416.905(a).

Determining whether a claimant is disabled requires the Commissioner to evaluate the claim based on a five-step procedure. 20 C.F.R. § 404.1520(a), 416.920(a); *see also McCoy v. Astrue*, 648 F.3d 605, 611 (8th Cir. 2011) (discussing the five-step process).

First, the Commissioner must decide whether the claimant is engaging in substantial gainful activity. If so, he is not disabled.

Second, the Commissioner determines if the claimant has a severe impairment that significantly limits the claimant's physical or mental ability to do basic work activities. If the impairment is not severe, the claimant is not disabled.

Third, if the claimant has a severe impairment, the Commissioner evaluates whether it meets or exceeds a listed impairment found in 20 C.F.R. Part 404, Subpart P, Appendix 1. If the impairment satisfies a listing in Appendix 1, the Commissioner will find the claimant disabled.

Fourth, if the claimant has a severe impairment and the Commissioner cannot make a decision based on the claimant's current work activity or on medical

facts alone, the Commissioner determines whether the claimant can perform past

relevant work.  If the claimant can perform past relevant work, he is not disabled.

Fifth, if the claimant cannot perform past relevant work, the Commissioner

must evaluate whether the claimant can perform other work in the national

economy.  If not, he is declared disabled.  20 C.F.R. § 404.1520; § 416.920.

<i>Evaluation of Mental Impairments</i>

The Commissioner has supplemented the familiar five-step sequential

process for evaluating a claimant's eligibility for benefits with additional

regulations dealing specifically with mental impairments.  20 C.F.R. § 920a. The

procedure requires an ALJ to determine the degree of functional limitation

resulting from a mental impairment.  The ALJ considers limitation of function in

four capacities deemed essential to work.  20 C.F.R. § 416.920a(c)(2).  These

capacities are: (1) activities of daily living; (2) social functioning; (3)

concentration, persistence or pace; and (4) deterioration or decompensation in

work or work-like settings.  20 C.F.R. § 416.920a(c)(3).  After considering these

areas of function, the ALJ rates limitations in the first three areas as either: none;

mild; moderate; marked; or extreme.  The degree of limitation with regard to

episodes of decompensation is determined by application of a four-point scale:

none; one or two; three; or four or more.  *See* 20 C.F.R. § 416.920a(c)(4).

After rating the degree of functional loss, the ALJ is to determine the severity of the mental impairments with reference to the ratings. 20 C.F.R. § 416.920a(d). If the mental impairment is severe, then the ALJ must determine whether it meets or equals a listed mental disorder. *Id.* This is done by comparing the presence of medical conclusions and the rating of functional limitation to the criteria of the appropriate listed mental disorders. *Id.* If the claimant has a severe impairment, but the impairment neither meets nor equals the listing, then the ALJ is to do a residual functional capacity assessment. *Id.*

## IV.    The ALJ's Decision

Applying the five-step sequential evaluation, the ALJ first determined that McAlister had not engaged in substantial gainful activity since the date she applied for SSI benefits, February 16, 2011.

At step two, the ALJ found that McAlister had severe impairments of seizure disorder, migraine headaches, bipolar disorder, Post-Traumatic Stress Disorder (PTSD), learning disorder, and borderline intellectual functioning.

At step three, the ALJ determined that McAlister does not have an impairment or combination of impairments that meets a listing. The ALJ found that none of her mental impairments singly or in combination meets or medically equals the criteria of listings 12.04, 12.05, or 12.06. In making this finding, the ALJ considered whether the "paragraph B" criteria of the listings ("paragraph D"

of listing 12.05) were satisfied. To satisfy the paragraph B criteria the mental impairment must result in at least two of the following: 1) marked restriction of activities of daily living; 2) marked difficulties in maintaining social functioning; 3) marked difficulties in maintaining concentration, persistence or pace or 4) repeated episodes of decompensation, each of extended duration.

The ALJ concluded that because McAlister has a driver's license, drives to appointments, makes and keeps medical care appointments, needs no assistance with budgeting, performs her own self care and some housework, and spends her days playing the computer and taking walks with her boyfriend, she has only mild impairment in activities of daily living.

He concluded that she is moderately limited in social functioning. In support of this, he noted that she has been engaged for two years and has a wedding date set. He noted her testimony that she gets along well with her fiancé and has reported that she has a lot of friends. He observed that there is no evidence past jobs ended due to difficulty getting along with people.

Finally in the area of concentration, persistence or pace, the ALJ found McAlister is moderately limited in concentration only, but that she can still concentrate well enough to do simple routine tasks with no limits in persistence or pace. He noted that she does not have mental retardation, that her testimony indicated school ended in 8th grade due to her behavior, not deficiencies in

cognitive functioning. He noted that she has worked in the past and there is no evidence that the jobs ended due to inability to understand, remember, and carry out instructions. Furthermore, at a November 2011 psychosocial assessment, she reported enjoying crosswords, playing on the computer and reading, none of which is consistent with mental retardation.

Next, the ALJ found McAlister has the residual functional capacity to perform light work as defined in 20 CFR § 416.967(b), except that she is unable to climb ladders, ropes, and scaffolds and she is limited to only occasional balancing, stooping, kneeling, crouching, and crawling. She must avoid dangerous unprotected heights and dangerous moving machinery. Mentally, she is limited to performing simple routine tasks that can be performed independently, that involve working primarily with things rather than other people and involve no direct interaction with the general public. Any social interaction with co-workers and supervisors must be superficial, involving no negotiation, arbitration, mediation, confrontation, or supervision of others.

In fashioning McAlister's RFC, the ALJ determined that while her impairments could be expected to produce McAlister's alleged symptoms, the alleged intensity, persistence, duration, and impact on functioning were not credible or consistent with the totality of the evidence. To the degree he found McAlister's statements credible, he noted they were reflected in his RFC.

In his review of the evidence, the ALJ gave little weight to the consultative examination by Dr. Frank Froman.  He noted that Froman reported McAlister presented as slightly anxious and with the stare of one who was slightly schizoidal, that questions had to be presented concretely to her and frequently clarified.  The ALJ found Froman's conclusions were inconsistent with other evidence in the record and with McAlister's presentation and behavior at the hearing.

He also determined Froman's global assessment of functioning (GAF) of 50 was unsupported by the evidence and gave it little weight.  In doing so, the ALJ noted that a that McAlister ended school in 8th grade due to her behavior not deficient cognitive functioning, that McAlister has a driver's license and drives herself alone to appointments, that she makes and keeps appointments for medical care, does crossword puzzles, uses a computer, reads, denies needing assistance with budgeting (Tr. 334)), and was never identified to have mental retardation by her school district.  Furthermore there is no evidence that her jobs ended due to inability understand, remember, and carry out instructions.

The ALJ also gave little weight to Dr. David Goldman's GAF of 45 for the same reasons he cited in support of his determination to give Froman's GAF little weight.  Additionally, he noted that at the time of Goldman's GAF determination, McAlister was not on medication, and mental status examinations from late January and late March 2012 were "completely normal."

The ALJ considered Goldman's medical source statement and gave it less than controlling weight due to its inconsistencies with Goldman's other findings as well as other evidence in the record. The ALJ found that McAlister frequently sought treatment for physical symptoms during the relevant period and treating and attending physicians seldom mentioned mental health symptoms or signs. He noted that Goldman's opinion that McAlister is impaired in her ability to interact appropriately with other people is inconsistent with her testimony that she has a lot of friends and a longstanding history of a stable relationship with her fiancé and "that she has a good relationship with her children that were removed by DFS." He found that her testimony and lack of documentation by treating physicians contradicted McAlister's testimony that she has one or two bad days a week when she fights with others and cries for no reason. He also noted he accounted for stress issues and conflicts with others by limiting his RFC to tasks that can be performed independently and jobs working primarily with things rather than people.

Finally, the ALJ found that other factors were also inconsistent with the severity of the limitations McAlister alleged; for instance, her doctors had made very few changes to her medications, suggesting that they were effective at controlling her mental and seizure issues, and the record indicated that McAlister had not taken her medications regularly. The third party function report completed

by McAlister's fiancé was consistent with a degree of functioning less severe than what she claimed.  Her fiancé indicated McAlister could prepare meals, perform household chores, shop in stores, communicate with friends on the computer, and visit family and friends.  The ALJ found that to the extent her fiancé noted that she gets distracted easily and does not get along well with others, this was inconsistent with the evidence previously discussed.  He determined there was no indication in McAlister's work history that she was unable to perform work due to an inability to follow instructions.

At step four, the ALJ found that the demands of McAlister's previous jobs exceed her RFC, and she is unable to perform past relevant work.

Finally, at step five the ALJ relied on the vocational expert's testimony to find that, given McAlister's RFC, age, education, and work experience, she is capable of making a successful adjustment to work that exists in significant numbers in the national economy.

## V.    <u>Standard of Review</u>

This court's role on review is to determine whether the Commissioner's decision is supported by substantial evidence on the record as a whole.  *Johnson v. Apfel*, 240 F.3d 1145, 1147 (8th Cir. 2003).  "Substantial evidence" is less than a preponderance but enough for a reasonable mind to find adequate support for the ALJ's conclusion.  *Id.*  When substantial evidence exists to support the

Commissioner's decision, a court may not reverse simply because evidence also supports a contrary conclusion, *Clay v. Barnhart*, 417 F.3d 922, 928 (8th Cir. 2005), or because the court would have weighed the evidence differently. *Browning v. Sullivan*, 958 F.2d 817, 822 (8th Cir. 1992).

To determine whether substantial evidence supports the decision, the court must review the administrative record as a whole and consider:

(1) the credibility findings made by the ALJ;

(2) the education, background, work history, and age of the claimant;

(3) the medical evidence from treating and consulting physicians;

(4) the plaintiff's subjective complaints relating to exertional and nonexertional impairments;

(5) any corroboration by third parties of the plaintiff's impairments; and

(6) the testimony of vocational experts, when required, which is based upon a proper hypothetical question.

*Stewart v. Sec'y of Health & Human Servs.*, 957 F.2d 581, 585–86 (8th Cir. 1992).

## VI.  <u>Discussion</u>

McAlister alleges the ALJ erred by (1) not according controlling weight to the opinion of plaintiff's treating physician, Dr. Goldman; (2) finding that plaintiff's mental impairments do not meet a listing of impairment under sections 12.04 or 12.06; and (3) making a patently erroneous credibility determination.

A.   Dr. Goldman's Opinion Should Not Be Accorded Controlling Weight

McAlister argues that Goldman's Medical Source Statement as to the severity of her impairments should have been accorded controlling weight in determining her RFC.  The regulations require that a treating source's opinion be given controlling weight if the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the case record."  20 C.F.R. § 416.927(c)(2).  However, "[a] treating physician's opinion does not automatically control, since the record must be evaluated as a whole."  *Perkins v. Astrue*, 648 F.3d 892, 897 (8th Cir. 2011).  An ALJ may discount or disregard the opinion of a treating physician where other medical assessments are supported by better medical evidence, or where the treating physician renders inconsistent opinions that undermine his credibility.  *Id*. at 897-98.

Dr. Goldman's Medical Source Statement indicates that McAlister has marked or extreme limitations in her ability to process instructions and make judgments on work-related decisions due to her limited intellectual function and inability to understand and retain information.  It also indicates that McAlister has marked or extreme limitations in her ability to interact appropriately with the public, co-workers, and supervisors due to extreme anxiety she experiences in being with others and her difficulty in utilizing healthy coping skills.

The ALJ's RFC makes it clear he accorded it at least some weight, as the RFC accounts for the limitations noted in Dr. Goldman's statement by providing that:

> [m]entally [McAlister] is limited to performing simple routine tasks that can be performed independently, that involve working primarily with things rather than with other people, and that involve no direct interaction with the general public. … any interaction with co-workers an supervisors must be superficial.

In addressing Dr. Goldman's Medical Source Statement, the ALJ did not accord it controlling weight because he found it to be "inconsistent with the rationale and findings" of Dr. Goldman's other opinions as well as other evidence in the record. I conclude that the ALJ's decision not to give Dr. Goldman's opinion controlling weight is supported by substantial evidence in the record as a whole. First, as the ALJ notes, Dr. Goldman's mental status examination reports of McAlister in late January and late March suggest that she is normal and doing well. (Tr. 339-341). In those "progress notes" he indicates that her appearance, behavior, activity level, orientation, affect, judgment, cognition and impulse control are normal. Under the section marked aggression, he has checked "absent." And in the March report he notes that during their appointment McAlister stated "I'm doing good." These reports are inconsistent with Dr. Goldman's Medical Source Statement, which indicates that McAlister's anxiety levels are so high she would have difficulty functioning around other people.

Dr. Goldman also completed a more in-depth written assessment of McAlister after their initial meeting in January 2012. The assessment notes that McAlister has a low GAF score and that she has reported having problems with concentration, but it states nothing about McAlister's level of social anxiety or any difficulty she has in processing instructions. She could spell "world" backwards correctly, and she could correctly recall three words she was given five minutes previously (and could do so in the same order that they were originally presented). Like the progress notes, this initial assessment appears to depict McAlister's impairments as having a more mild level of severity, which is inconsistent with the extreme level of severity asserted by Dr. Goldman in his Medical Source Statement.

The above-mentioned four reports (the initial assessment, two "progress note" reports, and the Medical Source Statement) are the only direct documentation from Dr. Goldman in the record. I conclude that the inconsistencies between the Medical Source Statement and Dr. Goldman's other assessments are sufficient to justify the ALJ's decision to discount Dr. Goldman's Medical Source Statement. *See Prosch v. Apfel*, 201 F.3d 1010, 1013 (8th Cir. 2000) ("it is proper for an ALJ to accord a treating physician's opinion less deference when the treating physician offers an additional assessment that undermines the reliability of the opinion relied upon by the claimant").

In his opinion, the ALJ also cited other evidence in the record as a whole that he felt was inconsistent with Dr. Goldman's opinions and rendered Dr. Goldman's opinion non-controlling. *See* 20 C.F.R. § 416.927(c)(2). Because I conclude that the previously discussed inconsistencies in Dr. Goldman's own assessments are sufficient to support the ALJ's decision not to accord Dr. Goldman's opinion controlling weight, I will not address other evidence in the record. *See Goff v. Barnhart*, 421 F.3d 785, 793 (8th Cir. 2005) (the ALJ's first reason for discounting the treating doctor's opinion was sufficient, and therefore the court need not comment on the ALJ's second reason).

B.    McAlister's Mental Impairments Do Not Meeting a Listing

McAlister next contends that the ALJ erred in finding that her mental impairments do not meet the requirements of Listing § 12.04 and § 12.06 of 20 C.F.R. pt. 404, supt. P, app. 1. For purposes of the impairments indicated in both § 12.04 and § 12.06, the required level of severity for these disorders is met, indicating the presence of a disability, when the requirements in both sections A and B are satisfied, or when the requirements in section C are satisfied. *See* 20 C.F.R. Part 404, Subpt. P, App. 1, §§ 12.04, 12.06. Section B of both Listings requires that a claimant's impairment result in at least two of the following:

1.    Marked restriction of activities of daily living; or

2.    Marked difficulties in maintaining social functioning; or

3.     Marked difficulties in maintaining concentration, persistence or pace; or

4.     Repeated episodes of decompensation each of extended duration.

The ALJ opined that because McAlister's impairments did not meet any of the Section B or Section C criteria, her impairments did not meet the requirements of Listings 12.04 or 12.06. McAlister appeals the ALJ's conclusions as to the Section B criteria. After careful consideration, I find that the ALJ's conclusion is supported by substantial evidence in the record as a whole.

First, the ALJ found McAlister suffered only a mild restriction of activities of daily living. He noted that she has a driver's license and drives alone to appointments, makes and keeps appointments for medical care, denies needing assistance with budgeting, reports spending her days playing on the computer and walking in the park and is able to do her own self care and household chores. (Tr. 14).

McAlister has argued that there is not substantial evidence in the record showing she has a driver's license, and I agree with her.[1] However, I still find that

---

[1] Both McAlister and her fiancé's function reports state that she does not have a driver's license, but both reported that she drives. McAlister testified that she does not have a driver's license, and Dr. Froman's report indicates she does not have a driver's license. The only record indicating she has a driver's license is the psychosocial assessment done by the MDMH. (Tr. 332-37). Notably, the second such assessment done by the MDMH states that McAlister does not have a driver's license. (Tr. 861-65).

the ALJ's determination that McAlister has only mild restriction in the area of daily living is supported by substantial evidence.

The regulations state that "[a]ctivities of daily living include adaptive activities such as cleaning, shopping, cooking, taking public transportation, paying bills, maintaining a residence, caring appropriately for your grooming and hygiene, using telephones and directories, and using a post office." 20 C.F.R. § Pt. 404, Subpt. P, App. 1.  The ALJ is charged with assessing the quality of these activities by their independence, appropriateness, effectiveness, and sustainability.  *Id.*

Although there is evidence that McAlister has, on occasion, failed to keep appointments with Dr. Hosley and the epileptologists in Columbia, Missouri, she successfully attended her frequent appointments with Genia Perry at MTBH and her appointments with Dr. Goldman.[2]  Just prior to the period of her alleged disability, there is evidence that she regularly attended prenatal visits.  Substantial evidence also exists in the record to support the ALJ's finding that McAlister performs her own self-care and household chores.  Both McAlister's and her fiancé's function reports note this, as do the MDMH psychosocial assessments.

_____

[2] The ALJ did not specifically mention this evidence, but he did note generally that McAlister successfully attends her appointments.  The ALJ also stated in his opinion that he carefully considered all the evidence, and notes reflecting McAlister's attendance at meetings with Perry and Goldman were part of the record before the ALJ.  *See Wildman v. Astrue*, 596 F.3d 959, 966 (8th Cir. 2010) (although required to develop the record fully and fairly, an ALJ is not required to discuss every piece of evidence submitted and failure to cite specific evidence does not indicate that such evidence was not considered).

The function reports also indicate McAlister is capable of paying bills, and the first psychosocial assessment from the MDMH states McAlister claims to do her own budgeting.  McAlister also testified that she is now helping to care for her mother in-law at her home.  Finally, the state appointed psychological consultant, Dr. Sullivan, reported that McAlister has only mild restrictions in her activities of daily living.

The ALJ next found that McAlister is only moderately limited in her social functioning.  He noted that she testified she has been engaged for two years, gets along well with her fiancé and has reported having a lot of friends.  He noted there is no evidence that past jobs have ended due to difficulty getting along with other people.

"Social functioning includes the ability to get along with others, such as family members, friends, neighbors, grocery clerks, landlords, or bus drivers."  20 C.F.R. § Pt. 404, Subpt. P, App. 1.  A claimant demonstrates impaired functioning by showing, for example, "a history of altercations, evictions, firings, fear of strangers, avoidance of interpersonal relationships, or social isolation."  *Id*.

I conclude that substantial evidence supports the ALJ's opinion that McAlister is only moderately limited in her social functioning.  As noted by the ALJ, McAlister has a seemingly supportive relationship with her fiancé.  Both of their function reports indicate she visits her family and goes shopping regularly.

McAlister's report also indicates she visits friends occasionally. Both of her psychosocial assessments from the MDMH state that she reported having a lot of friends and a close relationship with her fiancé's sister and daughter. Although McAlister wrote in her function report that she was fired from her McDonald's job for not getting along with others, at her hearing, she testified that she quit or lost this job because her then-husband would not give her a ride to work. *See Culbertson v. Shalala*, 30 F.3d 934, 939 (8th Cir. 1994) (the possibility that two inconsistent conclusions could reasonably be drawn from the same record does not prevent one particular finding from being supported by substantial evidence). McAlister's and her fiancé's function reports indicate that she has no problems with supervisors or authority. The record does not present any significant history of altercations with other people.

The ALJ found that McAlister did not have repeated episodes of decompensation for extended periods, and McAlister does not challenge this conclusion. She does challenge his finding, with regard to the third part of Section B, that she is not markedly limited in concentration, persistence or pace. However, in order to qualify for a listing, McAlister's impairments must result in at least two of the limitations listed in Section B. Because I find that substantial evidence on the record as a whole supports the ALJ's findings as to subparts 1, 2, and 4, it is not necessary for me to review the ALJ's conclusions as to subpart 3.

C.    The ALJ's Credibility Determination Was Supported by Substantial Evidence in the Record as a Whole

McAlister argues that the "specific reasons" given by the ALJ for discounting her credibility are not supported by the evidence in the record as a whole.

Under the framework set forth in *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984)*,* an ALJ must consider the following factors when evaluating a claimant's credibility:

> (1) the claimant's daily activities; (2) the duration, intensity, and frequency of pain; (3) the precipitating and aggravating factors; (4) the dosage, effectiveness, and side effects of medication; (5) any functional restrictions; (6) the claimant's work history; and (7) the absence of objective medical evidence to support the claimant's complaints.

*Buckner v. Astrue,* 646 F.3d 549, 558 (8th Cir. 2011). The ALJ is not required to explicitly discuss each *Polaski* factor. *Id.* "It is sufficient if he acknowledges and considers those factors before discounting a claimant's subjective complaints." *Strongson v. Barnhart,* 361 F.3d 1066, 1072 (8th Cir. 2004). Although an ALJ cannot discount a claimant's subjective allegations solely on a lack of objective medical evidence to support them, he may find a lack of credibility based on inconsistencies in the evidence as a whole. *See Ford v. Astrue,* 518 F.3d 979, 982 (8th Cir. 2008).

The "credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts." *Moore v. Astrue,* 572 F.3d 520, 524 (8th Cir.2009). Consequently, courts should defer to the ALJ's credibility finding when the ALJ explicitly discredits a claimant's testimony and gives good reason to do so. *Buckner,* 646 F.3d at 558.

Here, the ALJ found that although McAlister's impairments could reasonably be expected to produce her alleged symptoms, the alleged intensity, persistence, duration, and impact on functioning were not fully credible or consistent with the totality of the evidence. In determining her credibility, the ALJ properly discussed the *Polaski* factors, and his determination is supported by substantial evidence in the record as a whole. To the extent the ALJ found McAlister's assertions credible, they are reflected in the ALJ's RFC.

As to the alleged frequency of McAlister's seizures, at the hearing McAlister reported she has two per day, but the ALJ noted that Dr. Hosley's medical records indicate the frequency was unclear. McAlister reported to Hosley that her seizures were occurring every 2-3 weeks but other records indicated she had gone a year without having a seizure. Additionally, McAlister had recently reported to Hannibal Regional Hospital that she had four seizures in one day.

The ALJ also relied on evidence from Dr. Hosley's records that McAlister has not always been compliant with her medication and was very noncompliant

with her neurologic care.  In her brief, McAlister has argued that her failure to take medications is a symptom of one or more of her impairments, but Dr. Hosley's records do not attribute her failure to take medications directly to a mental or physical health problem.  And McAlister has pointed to no medical opinions or evidence supporting this assertion other than her general diagnoses of bipolar disorder.  *See Goff,* 421 F.3d at 793 (without evidence that claimant's failure to take medication was due to financial reasons, her failure to take medication was relevant to the credibility determination).

In finding that McAlister's migraines were less severe than she alleged, the ALJ opined that the record showed she had been seen in the ER for migraines in May and July 2010, but that there was little evidence to suggest they occurred with any regularity after this two-month period.   He observed that a progress note from the Community Health Center from October 26, 2010 indicated her mood, affect, concentration, and memory were normal and no neurological abnormalities were noted.

The ALJ also noted that physicians have made very few changes to McAlister's medication or dosage throughout the relevant period, indicating that, when compliant, she is being successfully medicated.  She has reported no side effects from her current medications.  The ALJ also opined that there was no indication in McAlister's work history that she was unable to perform work due to

an inability to follow instructions.  Her own testimony "attributed cessation of her previous work to reasons other than her impairments."  *See Ford*, 518 F.3d at 982 (ALJ was entitled to give some weight to evidence that claimant quit her bank job voluntarily—and not because of any impairment).[3]

Finally, in his credibility determination, the ALJ relied on McAlister's fiancé's third party function report, in which he indicated her degree of functioning is less severe than McAlister alleged at the hearing.   Her fiancé reported that she is able to prepare meals and perform household chores, such as cleaning and laundry. He indicated that she shops in stores, communicates with friends on the computer and visits family.  *See Mouser v. Astrue*, 545 F.3d 634, 638 (8th Cir. 2008) (evidence of claimant's general ability to care for himself and complete chores when asked was proper part of credibility determination).

Based on the foregoing, I conclude that the ALJ properly discredited McAlister's allegations as to the intensity, persistence, duration, and impact on functioning of her impairments, and there are good reasons for doing so. Therefore, I defer to his finding of reduced credibility.  *See Perkins,* 648 F.3d at 900 ("[i]f the

---

[3] As already noted, in McAlister's function report, she indicated she was fired from her job at McDonald's due to an inability to get along with a others, however, when she testified at the hearing, she stated her McDonald's job ended because her former husband refused to drive her to it. The ALJ was entitled to conclude McAlister's testimony was accurate.  *See Robinson v. Sullivan*, 956 F.2d 836, 838 (8th Cir. 1992) ("if it is possible to draw two inconsistent positions from the evidence and one of those positions represents the agency's findings, we must affirm the decision").

ALJ discredits a claimant's credibility and gives a good reason for doing so, we will defer to its judgment even if every factor is not discussed in depth.").

## VII. <u>Conclusion</u>

For the aforementioned reasons, the ALJ's determination that McAlister was not disabled is supported by substantial evidence in the record as a whole and the decision should therefore be upheld.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the commissioner is affirmed. A separate judgment in accordance with this Memorandum and Order is entered this same date.

_____
CATHERINE D. PERRY
UNITED STATES DISTRICT JUDGE

Dated this 18th day of March, 2015.